# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JUAN CARLOS CANA-GONZALEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>AUTONOMOUS MUNICIPALITY OF CAROLINA, ET AL.,<br><br>    Defendants. | **Civil No. 12-1573 (SEC)** |
| MOISES PEREZ-GARCIA,<br><br>    Plaintiff,<br><br>    v.<br><br>AUTONOMOUS MUNICIPALITY OF CAROLINA, ET AL.,<br><br>    Defendants. | **Civil No. 12-1728 (SEC)** |

## OPINION AND ORDER

Before the Court are the defendants' motion for summary judgment, Docket # 130, the plaintiffs' opposition thereto, Docket # 156, and the defendants' reply. Docket # 169. After reviewing the filings and the applicable law, the defendants' motion for summary judgment is **GRANTED**.

### Factual and Procedural Background

This is a case involving political discrimination claims stemming from the 2012 mayoral election in the Muncipality of Carolina (Muncipality). The plaintiffs, municipal

police officers Juan Carlos Cana-González (Cana) and Moisés Pérez-García (Pérez) (collectively, Plaintiffs) filed this § 1983 action, alleging that they were politically discriminated against for supporting a candidate with political views antagonistic to the current administration. Cana also alleges a separate retaliation claim for his testimony before a grand jury. The defendants are the Municipality, the Municipality's Mayor José Aponte-Dalmau (Mayor), in his official capacity, commissioner Freddie Márquez-Vergara (Márquez), captain Rubén Moyeno-Cintrón (Moyeno), lieutenant Elias Marrero-Correa (Marrero), in both their personal and official capacities, and members of the municipal police Wilber Medina-Pesante (Medina) and Iván Pizarro-Fuentes (Pizarro), in their personal capacities only (collectively, Defendants).[1] Plaintiffs originally filed separate suits, but because both suits involved common questions of law and fact, see Fed. R. Civ. P. 42(a)(2), the Court consolidated them. Docket # 28. Plaintiffs then filed an amended and consolidated complaint. Docket # 31.

The consolidated complaint alleges violations under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution, as well as under the Constitution and laws of Puerto Rico.  Docket # 31. But at the motion to dismiss stage, the Court dismissed Plaintiffs' Fifth and Fourteenth Amendment (Due Process and Equal Protection) claims, and their conspiracy and Article 1803 claims against Márquez, Marrero, Moyeno, Medina, and Pizarro.  See González v. Autonomous Muncipality of Carolina, Nos. 12-1573 & 12-1728, 2013 WL 5724130 (D.P.R. Oct. 2013). For the same reasons stated in the opinion of

---

[1] A suit against municipal officers in their oficial capacities is a suit against the municipality. Jarrett v. Town of Yarmouth, 331 F.3d 140, 146 (1st Cir. 2003).

October 21, 2013, Plaintiffs' Fifth and Fourteenth Amendment claims against the Mayor and the Municipality are hereby **DISMISSSED with prejudice**. See Docket # 130, pp. 37-40. The surviving federal law claims, then, are Cana's First Amendment retaliation claim and Plaintiffs' First Amendment political discrimination claims.

Defendants now move for summary judgment, arguing that Plaintiffs fail to establish a prima facie case of political discrimination because they cannot establish that they knew Plaintiffs' political affiliations. Docket # 130. Defendants further contend that "any employment actions caused by the Defendants responded to legitimate concerns of the Municipality," and that Plaintiffs' political affiliation was not a substantial or motivating factor for these actions. Id. Plaintiffs, on the other hand, counter that the record contains issues of material fact which preclude summary judgment. Docket # 156.[2] The relevant uncontested facts, in the light most favorable to Plaintiffs, follow. For ease of analysis, the Court will thus separate the facts by incidents.

Cana has been a municipal police officer in Carolina since 1998, and Pérez since 1991. Docket # 31, ¶¶ 12, 44. Through their tenure as police officers at the Municipality, Plaintiffs have worked at numerous stations (ten in total). Statement of Uncontested Facts ("SUF"), Docket # 129, ¶¶ 192-4. They have always served with the same rank and duties. Id. ¶ 195.

---

[2] Except for Cana's retaliation claims regarding his testimony before the grand jury, Pérez alleges that he suffered almost identical forms of adverse employment actions as plaintiff Cana did. The facts in support of each claim may differ slightly, in which case the Court will state it during the discussion. And not all defendants are involved in all of the alleged adverse actions.

Cana was politically active during the 2000, 2004, and 2008 election cycles on behalf of the Popular Democratic Party's (PDP) candidate for Mayor of Carolina, José Aponte Dalmau. Id. ¶ 186. For example, he participated in "walkabouts" and caravans in support of the Mayor. Id. ¶ 187. During this period, Cana was not active on behalf of the New Progressive Party (NPP) or any candidate affiliated with the NPP; nor was he politically active on behalf of any political candidate between 2009 and 2010. Id. ¶¶ 185, 191. Since 2011, however, Cana and Pérez actively supported Carlos Eliseo Rodríguez Pardo (Eliseo Rodríguez), the PNP mayor candidate. Dockets # 129-2, pp. 23-24 & 129-14, pp. 22-23.

*Cana's testimony before the grand jury*

On or around September 2008, Plaintiff Cana testified before a grand jury against Johnny Cruz-González, a close friend of Marrero and a police officer at the Muncipality, regarding a criminal incident. Id. ¶ 5-6; Plaintiffs' Opposition to SUF (OSUF), Docket # 155, ¶ 16. And although a criminal trial against Cruz-González was held in 2009, SUF ¶ 1, Cana never testified at the trial. Id. ¶ 8. On March 27, 2009, Cruz-González was found "not guilty" on all counts. Id. ¶ 2; Docket # 129-1, p. 20. One or two months after the criminal trial, Moyeno transferred Cana from the San Fernando Station to Transit Unit 14 (Unit 14). Id. ¶ 16; Docket # 31, ¶ 17.

*The Children's Museum incident*

On December 2, 2011, Plaintiffs were assigned by their immediate supervisor, Medina, to patrol the Julia de Burgos Park's parking lot and the Fidalgo-Diaz Avenue. SUF ¶ 33. Later that day, while patrolling on Fidalgo-Díaz Avenue, and upon reaching the intersection with the Sánchez Vilella Avenue, Plaintiffs noticed "that the side doors of the

[Children's] museum were open and [they] proceeded to verify the same, since there was no surveillance, nor staff." OSUF ¶ 45. There is a genuine issue of fact about whether the museum was within their assigned area. It is undisputed, however, that Plaintiffs entered the museum without receiving express authorization from Medina. SUF ¶ 58.

As it happened, the museum's director had been taking care of the final arrangements in preparation for the museum's grand opening. Id. ¶¶ 37, 39. He was outside the building when he saw Plaintiffs on the second floor. Id. ¶ 41. The director had strict orders that, before the grand opening of the museum, no one could enter the building without authorization. Id. ¶ 42; Docket # 129-10. The museum was considered one of the most high-profile and important projects of the Mayor's administration, and there was a lot of interest in the community, the media, and among the municipal employees regarding the attractions that would be featured in it. SUF ¶ 42. At any rate, the director then told Plaintiffs that they were not authorized to enter the museum, and asked them to leave. Id. ¶ 59.

The director, understanding that the security of the museum had been breached, immediately called Juan Ortiz-Crespo, Security Manager of the Municipality -who on that day was also the Acting Commissioner of the Carolina Municipal Police- to complain about Plaintiffs' unauthorized entry. Id. ¶ 60; Docket # 129-10. Ortiz-Crespo then contacted Marrero, Unit 14 Supervisor, to let him know about the director's complaint. SUF ¶ 64; Docket # 129-9. Marrero then contacted Medina to inform him about the incident, and to ask him to verify what had occurred. SUF ¶¶ 65-6. Medina then wrote an administrative complaint report for Plaintiffs' alleged "abandonment of post" and "unauthorized" entry into the museum in violation of the Regulations of the Carolina Municipal Police (Municipality's

Regulations).  Id. ¶¶ 72, 74. Ortiz-Crespo, as Acting Commissioner, referred the complaint report to the Municipality's Internal Affairs Investigation Unit (IU). Id. ¶ 76.

After an investigation and an informal administrative hearing, the IU recommended to suspend Plaintiffs from employment and salary. Id. ¶¶ 85-92. The Municipality adopted the IU's recommendation. Id. Plaintiffs were thus suspended from employment and salary. Id.

*Plaintiffs' vacations*

Shortly after the museum incident, Marrero changed Plaintiffs's vacation plan. OSUF ¶ 100. Plaintiffs accepted Marrero's decision, and even requested an additional week of vacation. SUF ¶ 103. They thus enjoyed compensatory time leave from December 26, 2011 until December 30, 2011, as requested, and paid vacation leave for a period of 30 days, from January 3 to February 16, 2012. SUF ¶¶ 104-105. On February 16, Marrero informed Cana that he was extending Plaintiffs' paid vacation leave until March 2, 2012, so that they could reduce their balance of accumulated holidays or compensatory time. Id. ¶ 106. This extension was made according to Marrero's practice of lumping certain accumulated "days off" (compensatory time, accumulated holidays, or actual vacations days) to an officer's paid vacation leave. SUF ¶ 106.

*Pizarro's complaint*

Plaintiffs talked about politics during working hours. Dockets # 129-2, p. 24 & 129-14, p. 6; OSUF ¶ 109. Cana also told other co-workers about his support for Eliseo Rodríguez, the Mayor's rival candidate. Docket # 129-2, p. 102. In his deposition, Cana explained that "I can talk about politics,… I understand that talking about a political

candidate is not illegal… It's permissible to talk [about political candidates during working hours]." Docket # 129-2, p. 104-6.

In late 2011, officers Federico Ortiz, José A. Febres, Carlos Birriel, and Pizarro complained to Marrero about Plaintiffs' political comments during working hours. Dockets # 129-7, p. 4-6 & 169, ¶ 118. Some of these officers also told Marrero that Plaintiffs were telling them "that they were going to be better paid … if the opposing candidate won." Docket # 129-7, p. 5-6. At that point, Marrero took no administrative action because "there was no interest from the staff which is the foundation for me to write up an administrative complaint … [and because he chose not to] due to their 'quality' as employees." Docket # 129-7, p. 8. But on March 28, 2012, Pizarro wrote a memorandum complaining about Plaintiffs' comments, and requesting Marrero to "take action" with regard to this matter. SUF ¶ 121; Docket # 143-15. Pizarro stated that Plaintiffs were saying that "when the NPP wins in Carolina many persons would be crying and that soon there will be Federal arrests, including that of the Mayor." Id. According to Pizarro, these comments were made on more than three occasions. Id.

Given Pizarro's written complaint, Marrero refererred the matter to the police commissioner, Márquez. As a preventive measure, Márquez relocated Plaintiffs. Id. ¶ 129. The incident was later investigated, and it was concluded that Plaintiffs' conduct violated the Municipality's Regulations. Id. ¶ 139.[3] Accordingly, the Municipality issued letters of

---

[3] During the investigation, Federico Ortiz testified that Plaintiffs "indicated to [him] that everybody working at the Carolina Municipality… Mayor Aponte and all their staff were corrupt … that they were putting money in their pocket." Docket # 143-18, pp. 2-3. He further stated that "Cana would show a 't-shirt' of candidate Carlos Eliseo which he was wearing under his uniform, he would open his shirt and tell me:

intent to suspend Plaintiffs from employment and salary. Id. ¶ 145.[4] After an informal hearing, the Municipality adopted the decision to suspend Pérez from employment and salary. Id. ¶ 149. Cana has not yet received the letter adopting the decision to suspend him. Id.[5]

> *"El Comisionado" Facebook page*

On April 17, 2012, Moyeno requested that Márquez conduct an administrative investigation of Cana. SUF ¶ 200; Docket # 143-25, p. 2. Moyeno's request was based on confidential documents he received about Cana's alleged administration of "El Comisionado" Facebook page. Id. The Facebook page contained posted comments against various members of the Municipality and the Mayor. Id. Márquez referred the matter to the IU for investigation. SUF ¶ 202; Docket # 143-26. The IU recommended the dismissal of the complaint for lack of evidence. Id. No adverse action was taken against Cana. SUF ¶¶ 202-203.

**Standard of Review**

Summary judgment is appropriate only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one 'that might affect the outcome of the suit under

---

'Listen, this is the one winning and he'll give me the rank of sergeant.'" Id. at 3; accord Dockets # 143-17 to 143-24.

[4] According to the Municipality's Regulations, it is considered a grave fault for a municipal police officer to (1) propagandize or take other action in favor or against any political party or candidate while in service or in uniform; (2) bring into question the integrity, honesty, or competency of any member of the municipal police, civil employee, or officer of the municipality; (3) use offensive, improper, or denigrating language against the Governor, the Mayor, members of the municipal police, among others; and (4) make insolent and disrespectful expressions against superiors or other municipal officers. SUF ¶¶ 139-42.

[5] The Court assumes without deciding that, even though Cana has not received that letter, he has suffered an adverse employment action. See Docket # 156, pp. 26-27.

the governing law.'" <u>Leary v. Dalton</u>, 58 F.3d 748, 751 (1st Cir. 1995) (quoting <u>Morrissey v. Boston Five Cents Sav. Bank, F.S.B.</u>, 54 F.3d 27, 31 (1st Cir. 1995)). And an issue of material fact is genuine "'[i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u>

The Court may consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials …" <u>Id.</u> 56(c). At this stage, it is axiomatic that courts "may not weigh the evidence," <u>Casas Office Machs., Inc. v. Mita Copystar Am., Inc.</u>, 42 F.3d 668 (1st Cir. 1994), and yet must construe the record in the "light most flattering" to the nonmovant. <u>Soto-Padró v. Public Bldgs. Authority</u>, 675 F.3d 1 (1st Cir. 2012). A court must similarly resolve all reasonable inferences in favor of the non-moving party. <u>Tolan v. Cotton,</u> 134 S.Ct. 1861, 1863 (2014) (per curiam).

In order to succeed in showing that there is no genuine dispute of material fact, the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file … demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" <u>Ocasio-Hernández v. Fortuño-Burset</u>, 777 F.3d 1, 4 (1st Cir. 2015) (quoting <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000)). "'[I]f the summary judgment record satisfactorily demonstrates that the plaintiff's case is, and may be expected to remain, deficient in vital evidentiary support, this may suffice to show that the movant has met its initial burden'" <u>Id.</u>

**Applicable Law and Analysis**

*Political Discrimination*

It goes without saying that political discrimination is proscribed by the First Amendment of the United States Constitution.  Kusper v. Pontikes, 414 U.S. 51, 56-57 (1973).  As the First Circuit has remarked: "'The right to associate with the political party of one's choice is an integral part of the basic constitutional freedom to associate with others for the common advancement of political beliefs and ideas protected by the First Amendment.'" García-González v. Puig-Morales, 761 F.3d 81 (1st Cir. 2014) (quoting Carrasquillo v. P.R. ex rel. Justice Dep't, 494 F.3d 1, 4 (1st Cir. 2007)). "[T]he First Amendment protects associational rights … [and] the right to be free from discrimination on account of one's political opinions or beliefs."  Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004).

In order to bring a successful political discrimination claim, a plaintiff must establish the following four elements: (1) that the plaintiff and the defendant belong to opposing political affiliations; (2) that the defendant has knowledge of the plaintiff's political affiliation; (3) that there is an adverse employment action; and (4) that political affiliation was a substantial or motivating factor for the adverse employment action. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir. 2011). The plaintiff bears the initial burden of producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that plaintiffs' constitutionally protected conduct was a substantial or motivating factor behind the adverse employment action. Acevedo-Díaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993). If the plaintiff satisfies his prima facie burden, under the Mt. Healthy burden-shifting mechanism for evaluating free speech claims, and which has also been applied in the political discrimination context, the defendant may then rebut that showing by proving that

he would have taken the same action regardless of the plaintiff's political beliefs or protected conduct. Reyes-Pérez v. State Ins. Fund Corp., 755 F.3d 49, 54 (1st Cir. 2014); Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977). The Mt. Healthy defense has been described by the Supreme Court in the following way: "it deals with employment actions driven by 'mixed motives,' and provides that where there are both 'lawful' and 'unlawful' reasons for the adverse employment action, 'if the lawful reason alone would have sufficed to justify the [action], 'then the employee cannot prevail." Soto-Padró v. Public Buildings Authority, 675 F.3d 1, 6 (1st Cir. 2012) (citing McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 359 (1995)).

Where, as here, the challenged employment actions fall short of discharge or demotion—what  has come to be known as "political harassment"/"short of dismissal" claims—the  plaintiff must show that the challenged actions resulted in a work environment "unreasonably inferior" to the norm for the position, and that the actions were motivated by discrimination based on political affiliation. Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 766 (1st Cir. 2010) (quoting Agosto-De-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir. 1989). But this is so only if the discriminatory acts are "sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party."  Welch v. Ciampa, 542 F.3d 927, 936 (1st Cir. 2008).

*Claims arising from the museum incident*

As noted, the Municipality suspended Plaintiffs from employment and salary as a result of the museum's director complaint. SUF ¶ 92. Medina, Marrero, and the Mayor are the only defendants implicated in this incident.

The claims against Marrero are swiftly dispatched. With regard to him, the only evidence on record is that (1) he requested that Medina verify "what had occurred and to speak with both Plaintiffs," as ordered by the then Acting Commissioner of the Municipal Police, Ortiz-Crespo, who is not a defendant in this case, SUF ¶¶ 64-67; and (2) that he signed Medina's administrative complaint report as the person who receives such complaints due to his supervisory position. SUF ¶ 75. But the summary judgment record contains no evidence that Marrero's actions resulted in an adverse employment action against Plaintiffs because of this incident. No causal connection can be established between Marrero's actions and any ultimate employment action taken as a result of the museum incident. See Torres-Santiago v. Municipality of Adjuntas, 693 F.3d 230, 238-39 (1st Cir. 2012) (stating that "the mere fact that the supervisory defendants 'approved' the plaintiffs' transfers by accepting the placements is insufficient to show that the supervisory defendants were involved in the transfer decision-making process… only persons who were directly involved in the wrongdoing may be held liable").

Things are more complicated as to Medina. It bears noting, that the allegations against him arise only from his participation in this incident. Recall that Medina wrote the administrative complaint report against Plaintiffs for alleged "abandonment of post" and "unauthorized" entry into the museum. Docket # 129, p. 2. The Court assumes without deciding that Medina knew about Plaintiffs' political affiliation, and that his actions constituted an adverse employment action.  The Court thus turns to the fourth prong of the prima facie case; that is, whether political affiliation was a substantial or motivating factor for the adverse employment action.

Plaintiffs only evidence of Medina's political animus is that he told Pérez that the instructions to file the complaint "had come from higher up, from management or higher up, that somebody was spreading the shit." Dockets # 155-4 & 156, p. 34-35. It is uncontested that Marrero requested Medina to investigate the museum incident; it is also uncontested that Marrero received in turn that instruction from Ortiz-Crespo, who is not even a defendant in this case and against whom there is no evidence or allegation of politically discriminating against Plaintiffs. More to the point, Medina's alleged statement that the instructions "had come from higher up," is a vague remark and insufficient, in and of itself, for a jury to conclude that Medina's actions were motivated by a discriminatory animus because of Plaintiffs' political affiliation. Padilla-García v. Rodríguez, 212 F.3d 69, 74 (1st Cir. 2000) (Stating that a showing of political animus "requires more than merely 'juxtaposing a protected characteristic –someone else's politics- with the fact that plaintiff was treated unfairly'.") Thus, Plaintiffs attempt to create a triable issue from this comment fails.

As to the Mayor, there is not enough evidence the he had knowledge of Plaintiffs' affiliation when they were suspended as a result of this incident. The fact that the Mayor may have seen Plaintiffs at the NPP Committee is not sufficient evidence to show knowledge of political affiliation. See Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 37 (1st Cir. 2004) (having met Plaintiff during routine campaign canvassing does not lead to a reasonable inference that defendant knew about plaintiff's political affiliation), vacated and remanded on other grounds, 546 U.S. 1163 (2006); Román v. Delgado-Altieri, 390 F. Supp. 2d 94, 102-3 (2005) (stating that plaintiff cannot prove defendant's knowledge of his

political affiliation merely through "testimony of having been seen, or, for that matter, met during routine campaign activity participation, having been visited by the now incumbent defendant while said defendant was a candidate to the position he now holds, … [or] by having political propaganda adhered to plaintiff's car and/or house").

And, evidence that the Mayor acquired knowledge of Plaintiffs' political affiliation because they sent him a copy of two identical letters (complaint letters) that they wrote to Marrero is simply insufficient. Docket # 129-3, pp. 38-39; Dockets # 165-1 & 165-2. Making all inferences in Plaintiffs' favor, the Court assumes, dubitante, that the Mayor had seen the complaint letters before he approved the proposed sanctions.[6] The complaint letters, however, state only that they believe that the change and extension of their vacation leave was "discriminatory treatment," and that they felt "persecuted, harassed, pressured, and treated unequally and discriminatorily, because of [their] political affiliation." Dockets # 165-1 & 165-2. But the complaint letters are silent about Plaintiffs' political affiliation.

As additional evidence of the Mayor's knowledge, Plaintiffs state only that "Defendants conveniently fail to address the fact that it was (and still is) the Mayor who warned Cana and Pérez through letters … of his intent to impose disciplinary measures on them for making political comments … in the workplace (the Pizarro's incident)." The Pizarro's incident, however, ocurred on March 28, 2012. So, even assuming for the sake of argument that the Mayor acquired knowledge as a result of the Pizarro's incident, there is no

---

[6] The Mayor's letters of intent to suspend Plaintiffs for the museum incident are dated February 21, 2012, Docket # 143-4, and the complaint letters are dated February 21, 2012 and February 23, 2012.

evidence as to the Mayor's knowledge before March 28, 2012; that is, when the Mayor issued the letters of intent to suspend them for the museum incident.[7]

But even if the Court were to determine that the Mayor was aware of Plaintiffs' political affiliation, there is no evidence on record about his political animus against the Plaintiffs. Approving a proposed disciplinary sanction, without more, is insufficient to conclude that Plaintiffs' affiliation to the NPP or political support to the Mayor's rival candidate were a substantial or motivating factor for the adverse employment actions. González-Piña v. Rodríguez, 407 F.3d 425, 432 (1st Cir. 2005) (holding that, even if the opposing party mayor was aware of plaintiff's support for a rival mayoral candidate in the primary, that, by itself, is insufficient to establish political animus); see also Padilla-García, 212 F.3d at 74.

*Plaintiffs' vacations*

At the outset, the Court clarifies that the only defendant implicated in the incident regarding Plaintiffs' vacations is Marrero.

The Court has not found any First Circuit case in the First Amendment context analyzing whether changing an employee's vacation schedule and extending an employee's "paid" vacation leave constitutes an adverse employment action. The First Circuit has cited with approval other circuit court cases in which "a campaign of minor harassments, including removing plaintiff's long distance phone line, denying requests for vacation time, confining duties to paperwork, and not allowing her to change lunch hour, was sufficient to support a First Amendment claim." Barton v. Clancy, 632 F.3d 9, 29-30 (1st Cir. 2009)

---

[7] The letters of intent are dated February 21, 2012. See Docket # 143-4.

(emphasis added) (citing Pieczynski v. Duffy, 875 F.2d 1331, 1335-36 (7th Cir. 1989)). Here, no reasonable jury could find such a campaign. Furthermore, Marrero did not deny Plaintiffs' request for vacation time; he merely changed the dates for their vacation time.

In the Title VII context, however, other sister courts have held that denying vacation leave on the specific dates requested, as long as the employee is not subject to a complete bar on taking her vacation time, and extending an employee's "paid" vacation leave do not constitute an adverse employment action. See Murphy v. The McGraw-Hill Companies, Inc., No. 02-40136, 2003 WL 21788979, *4 (S.D. Iowa July 30, 2003); accord Cruz v. New York State Dept. of Corrections and Community Supervision, No. 13-1335, 2014 WL 2547541 (S.D.N.Y. June 4, 2014) ("[t]he particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materialy adverse' employment action" (quoting Boyd v. Presbyterian Hospital, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001))); Paniagua v. Texas Dept. of Criminal Justice, No. 99-2681L, 2001 WL 540908, *6 (N.D. Tex. May 18, 2001) (denial of employee's request to take her vacation during a specific month of the year does not constitute an adverse employment action); Blackwell v. SecTek, Inc., No. 13-1536, __ F. Supp. 3d __, 2014 WL 3834984, *8 (D.D.C. Aug. 5, 2014) ("[a]lthough forcing an employee to take leave without pay may constitute an adverse employment action, courts are reluctant to find an adverse action where an employee is paid for the time off- even if the employee has to take vacation time.") (citations ommitted); Walker v. Johnson, 501 F. Supp. 2d 156, 172 (D.D.C. 2007) (forcing an employee to take ten hours of paid administrative leave was not adverse employment action).

The same result should follow for showing an adverse employment action in the First Amendment context, since these actions are "mere inconveniences" that do not meet the "unreasonably inferior" standard. There is no evidence on record that Plaintiffs were stigmatized by these actions or that their working environment was substantially altered. See Rodríguez-García, 610 F.3d at 766. In fact, Plaintiffs even requested an additional week before their vacation period, which Marrero granted to them. Docket # 129-7, p. 100. In short, Plaintiffs failed to meet their burden on this front.

In any event, no reasonable jury could conclude that Marrero did this out of political animus.  Cana stated that when Marrero changed their vacation schedule Marrero told him personally that "you're going to continue on vacation until January so I [Cana] would cool down because I was hot." OSUF ¶¶ 27 & 100; Docket # 155-1, p. 83-84. It is not clear whether Marrero shifted Plaintiffs' vacations because they were experiencing stress and tension as a result of the investigative phase of the museum incident; or, as argued by Plaintiffs, so they could "cool down", in reference to their political activism. OSUF ¶¶ 27, 100; Docket # 155-1, p. 11. In any event, this stray and ambiguous statement together with the fact that Plaintiffs were NPP members supporting the Mayor's rival candidate is insufficient evidence to establish Marrero's political animus against them. And the fact that Marrero's memorandum "make[s] no mention at all about the implementation of a preventive anti-harassment policy" is of no consequence. Docket # 156, p. 31. The extension of Plaintiffs' vacation leave was in accordance with Marrero's common practice and an apparent municipal policy that seeks to limit excess accumulation of vacation days,

compensatory time, and "accrued holidays."  Dockets # 129-5 & 129-7, p. 17. There is no evidence that other officers were not subjected to similar actions. SUF ¶¶ 28-31.[8]

       Plaintiffs also argue that Moyeno, Márquez, and the Mayor should be held liable because they "failed to address … [Plaintiffs'] legitimate concerns about Marrero." Docket # 156, p. 32. According to Plaintiffs, they informed Moyeno, Márquez, and the Mayor, either through the complaint letters or personally, about the incident in which Marrero changed their vacation schedule and extended their vacation leave. This claim is thus premised on supervisory liability. A supervisor who does not participate in the alleged adverse employment action "'can be held liable … [only] if (1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was 'affirmative[ly] link[ed]' to that behavior in the sense that it could be characterized as 'supervisory encouragement, condonation, or acquiescence' or 'gross negligence [of the supervisory] amounting to deliberate indifference.'"" Welch, 542 F.3d at 937 (1st Cir. 2008) (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir. 1995)); see also Rodríguez-García, 610 F.3d at 756. But because Marrero's actions did not result in a

---

[8] Plaintiffs do not deny that Marrero acted pursuant to a municipal policy and the Municipality's regulations. Docket # 129-7, p. 103-104. Instead, they objected "based upon the best evidence rule," without supporting their denial by a citation to the record or to legal authorities. See Local Rules 7 & 56. They specifically stated that Defendants make "reference to a Municipal policy that is not being presented as an exhibit." OSUF ¶¶ 28-31. First, Plaintiffs did not elaborate on this argument, even after Defendants' reply. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Second, as argued by Defendants in their reply, the validity of a policy "is not dependent on whether they are written or verbal." See Talib v. Gilley, 138 F.3d 211, 215 (5th Cir. 1998). "A  policy is a policy -the question is simply whether the record supports a finding that a policy exists." Id. Here, Defendants submitted a sworn statement by Moyeno stating that "[t]he Municipality of Carolina has a policy in place that seeks to and limit excess the accumulation of [vacations days, compensatory time, and "worked holidays"] … the policy requires the supervisor to balance out the amount of accumulated days depending on the category of accumulated days and the number of accumulated days in each respective category." SUF ¶ 29; Docket # 129-5, ¶ 4. Plaintiffs' did not controvert the existence of this policy.

constitutional violation, Moyeno, Márquez, and the Mayor cannot be held liable for their alleged inaction.

   *Pizarro's complaint*

   On the other hand, Marrero, Márquez, Pizarro, and the Mayor are all involved in the Pizarro's complaint incident. As a result of the complaint, Plaintiffs were transferred from Unit 14 to another station, and suspended from employment and salary.

   As noted, Marrero referred Pizarro's complaint or grievance to Márquez for "the action [he] may deem proper." Docket # 143-16, p. 2. He did recommend and request Plaintiffs' transfer "in order to avoid any confrontation." Docket #  143-16. As an alleged preventive measure, Márquez transferred them out from Unit 14. They were later suspended from employment and salary.

   As an initial matter, Plaintiffs' transfer from Unit 14 to a different station is not an adverse employment action. The evidence on record shows that the norm for their position was to be subject to transfers periodically. According to the record, they worked at numerous stations (10 in total) through their tenure as police officers at the Municipality, and they always served with the same rank and had the same duties at all of the stations. SUF ¶ 192. There is no evidence on record that, when transferred, Plaintiffs were divested of significant responsibilities, that their work conditions changed, that their working environment was substantially altered, that it constituted a hardship due to the location of the new station, or that their salary was reduced. See Rodríguez-García, 610 F.3d at 756.

   Plaintiffs argue, however, that they enjoyed a "salary differential and the perk of using the police motorcycle to commute to and from work as part of the benefits attached to

their work in the Municipal Police's Traffic Division" – Unit 14. Docket # 156, p. 28; Docket # 155, p. 55, ¶ 6. But the use of a motorcycle to perform their duties as municipal police officers is not the norm for their position. Rather, as municipal police officers, Plaintiffs <u>may</u> be assigned to patrol on foot, car, or motorcycle. Docket # 129, ¶¶ 196-7. They have "not always been assigned a motorcycle." <u>Id.</u> Even before 2011—when they started to support the Mayor's rival candidate—they had been transferred in various occasions (and for the most part) to units in which they did not have the perk of a motorcycle and salary differential. Therefore, simply by being transferred out of Unit 14 and no longer being able to perform their duties on motorcycle and receiving a salary differential, Plaintiffs do not meet the "unreasonably inferior" standard. <u>See Agosto-De-Feliciano</u>, 889 F.2d at 1219 ("An employee who has lost merely the 'perks' of his position … would not meet the 'unreasonably inferior' standard"). In any event, Plaintiffs' transfer was part of the disciplinary actions taken against them as a result of Pizarro's complaint; and as shown below, Defendants are entitled to the <u>Mt. Healthy</u> defense.

Plaintiffs have also failed to meet their burden that their political affiliation was a substantial or motivating factor for their suspension.[9] Plaintiffs only evidence as to Marrero's political animus is (1) that Marrero knew that Plaintiffs were NPP members supporting the Mayor's rival candidate; (2) that Marrero's memorandum to Márquez state that his "function as supervisor is to see that the staff be … free from politics" and "make no mention at all about the implementation of a preventive anti-harassment policy;" and (3)

---

[9] The same evidence of political animus was offered to support all other claims against Marrero.

Marrero's comment to Cana that "he was watching me" and that he was going to continue on vacation until "Cana would cool down." See Docket # 156, pp. 30-40.

That Marrero knew that Plaintiffs were NPP members supporting the Mayor's rival candidate is insufficient to establish a political discrimination claim. Plaintiffs also claim that when Marrero stated in his memorandum that his "function as supervisor is to see that the staff be in a sound environment, free from politics in the work area and to do our job," what "Marrero really meant was that his station had to be free from persons with different political ideologies." Docket # 156, p. 32. This is, of course, unsupported speculation that must be ignored by the court when evaluating a motion for summary judgment. See Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013).

As to Marrero's comment to Cana that "[a]fter the end of the trial he [Marrero] was watching me," Docket # 129-2, p. 8-9; Docket # 155-1, p. 8-9; Docket # 156, p. 32, there is no evidence on record in support of Plaintiffs' contention that this comment was made in 2011. In fact, according to Cana's own admission, it must have been made in 2009. In his deposition testimony, Cana states that it was "[a]fter the trial being over, that I come under his supervision." Marrero became Cana's supervisor in Unit 14 one or two months after the end of Cruz-González's criminal trial; that is, around April or May 2009.

As to Márquez and the Mayor, besides referring the complaint and approving the disciplinary action, Plaintiffs have not pointed to specific evidence of their political animus. Finally, as to Pizarro, he was not Plaintiffs' supervisor; he was their co-worker.  Pizarro, like any employee, is entitled to complain about the behavior of other co-workers. A single

grievance by a co-worker with no supervisory power is not political discrimination. <u>See</u> <u>Rosario-Urdaz v. Velazco</u>, 433 F.3d 174, 179 (1st Cir. 2006).

But even assuming, arguendo, that Plaintiffs have made a prima facie case of political discrimination, Defendants would have reached the same decision to transfer and suspend Plaintiffs from employment and salary, because their actions violated the Municipality's regulations. And there is undisputed evidence on record in support of this contention. <u>See</u> SUF ¶¶ 139-142. "[I]t is difficult to see how a supervisor [Marrero and Márquez] … could have done anything less" than order an investigation and take the corresponding disciplinary actions. <u>Cepero-Rivera v. Fagundo</u>, 414 F.3d 124, 133 (1st Cir. 2005). This conclusion is fortified by the lack of competent evidence about Marrero exercising any influence over Márquez, or as to a conspiracy between Defendants and against the Plaintiffs. Moreover, there is no evidence that other employees <u>similarly situated</u> were not disciplined. <u>See</u> <u>Vélez-Rivera v. Agosto-Alicea</u>, 437 F.3d 145, 153 (1st Cir. 2006) (stating that under the <u>Mt. Healthy</u> defense, defendants must also demonstrate that they "have a practice of taking corrective action against all employees …  or could otherwise show that they would have taken the corrective action anyway); <u>see also</u> <u>Kauffman v. Puerto Rico Telephone Co.</u>, 841 F.2d 1169, 1172-73 (1st Cir. 2008) (affirming the entry of summary judgment for the defendants "in situations where plaintiffs had <u>no evidence of differential treatment</u> in the personnel actions taken against those who were illegally appointed") (emphasis added). And, since Plaintiffs have failed to discredit the proffered nondiscriminatory reason, Defendants are entitled to the <u>Mt. Healthy</u> defense.

*"El Comisionado" Facebook page*

Moyeno and Márquez are the only defendants involved in the Facebook page incident. In fact, Plaintiffs' political discrimination claim against Moyeno is based only on this incident.

According to the record, Moyeno ordered Márquez to conduct an administrative investigation against Cana. Moyeno's request was based on confidential documents he received which identified Cana as the person who was "allegedly [discrediting] several members of the corps, including members of the Cabinet and the Hon. Mayor José C. Aponte Dalmau from Carolina" in Facebook. Docket # 143-25. Márquez then referred Moyeno's memorandum to the IU for investigation.

Plaintiffs did not meet their prima facie burden on this front. There is no evidence on record from which a reasonable jury could conclude that Moyeno's request and Márquez's referral for investigation constituted an unjustified disciplinary threat. The fact that the complaint was dismissed for lack of evidence does not necessarily mean that it was without basis. Coszalter v City of Salem, 320 F.3d 968, 976-77 (9th Cir. 2003) (holding that "an unwarranted disciplinary investigation may establish Section 1983 liability) (emphasis added).

But even if Moyeno and Márquez's actions were unjustified and could be considered an adverse employment action in the First Amendment context, Plaintiffs provide no evidence of political animus. Docket # 156, p. 30-40.  A showing of political animus "requires more than merely 'juxtaposing a protected characteristic –someone else's politics- with the fact that plaintiff was treated unfairly'." See Padilla-García, 212 F.3d at 74.

One final point bears emphasis. Trivial actions—such as Plaintiffs' transfer, the change in their vacation schedule and the extension of their vacation leave, together with the complaint filed as a result of the "El Comisionado" Facebook page—individually or taken together and under the particular facts of this case, are not sufficiently severe to support a finding that the challenged actions resulted in a work environment "unreasonably inferior" to the norm for the position. Accordingly, Plaintiffs' political discrimination claims against all Defendants are **DISMISSED with prejudice**.

*Cana's retaliation claim*

Cana's retaliation claim is based on his testimony before the grand jury on or around September 2008. Cana argues that Moyeno transferred him to Unit 14, and that Marrero changed his vacation schedule (2011) and extended his vacation leave (2012) in retaliation for his testimony before the grand jury.

The First Circuit has articulated "a three-part test for determining whether a challenged employment action violated a public employee's First Amendment right to freedom of speech." Rodríguez-García, 610 F.3d at 765. Under this test, the Court must first examine whether the employee spoke as a citizen on a matter of public concern. Id. (quoting Curran vs. Cousins, 509 F.3d 36 (1st Cir. 2007). Second, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. Finally, the employee must "show that the protected

conduct expression was a substantial or motivating factor in the adverse employment decision." Id.[10] Here, Defendants contest only the third prong.[11]

There is no evidence on record about Moyeno's participation in the decision to transfer Cana. SUF ¶ 18; OSUF ¶ 18. Cana argues only that Moyeno, as head of "Field Operations," was involved in the decision to transfer him to Unit 14 because "nobody changes from stations unless it goes through Field Operations." OSUF ¶ 18; Docket # 129-1, p. 28. This fact, even if true, is insufficient to show that Moyeno was involved in the decision to transfer Cana. See Torres-Santiago, 693 F.3d at 238-39 (stating that "the mere fact that the supervisory defendants 'approved' the plaintiffs' transfers by accepting the placements is insufficient to show that the supervisory defendants were involved in the transfer decision-making process"). "[O]nly persons who were directly involved in the wrongdoing may be held liable." Id. (quoting Martínez-Vélez v. Rey-Hernández, 506 F.3d 32, 41 (1st Cir. 2007)). And put simply, there is no evidence that Moyeno was directly involved.

Still more, Cana has not produced competent evidence to demonstrate that his transfer to Unit 14 resulted in "unreasonably inferior" conditions such that a reasonably hardy individual would be deterred from exercising his constitutional rights. There is no

---

[10] Political discrimination and retaliation cases "are intrinsically similar, and, in certain circumstances, courts evaluate the evidence in the same manner." Rosaura Bulding Corp. v. Municipality of Mayagüez, 778 F.3d 55, 66 (1st Cir. 2015). However, "[u]nder political discrimination cases, 'government officials are forbidden from taking adverse action against public employees on the basis of political affiliation or belief.'" Id. (quoting Mercado-Berrios v. Cancel-Alegría, 611 F.3d 18, 22 (1st Cir. 2010)).  On the other hand, retaliation cases "'call[] for a different, though related, inquiry' when a public employee's speech, rather than her political affiliation or belief, is at issue." Id.
[11] Defendants contend that, in the alternative, this claim must be dismissed because it is time-barred. Docket # 130, pp. 35-36, n. 7. The Court need not address this matter.

evidence on record that, when transferred to Unit 14, Cana was divested of significant responsibilities; that his work conditions changed; that his salary or other benefits were reduced; or that his working environment was substantially altered. See Rodríguez-García, 610 F.3d at 766. On the contrary, as explained above, Unit 14 is a transit unit in which the officers have the perk of "using the police motorcycle to commute to and from work" while receiving a salary differential. Cana thus suffered no adverse effect as a result of his transfer. Docket # 129-1, p. 8.

Nor can Cana meet the motivation prong. The only additional evidence in support of his contention is that "on various occasions [Cana] heard [Moyeno] in the station talking about the police [officers] that were … cited by the FBI or the grand jury." But Cana never explains what Moyeno said about the police officers; whether he expressed any negative comment about them; or any other specific fact from which a reasonable jury could conclude that his transfer was motivated by his testimony before the grand jury. This evidence is insufficient to create a triable issue of improper motive. Broad conclusory allegations are not a substitute for a meaningful factual context. Air Sunshine, Inc. v. Carl, 663 F.3d 27, 37 (1st Cir. 2011) (quoting Néstor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 42 (1st Cir. 1992)). And the Court shall afford no evidentiary weight to unsupported speculation or evidence which, in the aggregate, is less than significantly probative. Tropigas de Puerto Rico v. Certain Underwriters at Lloyd's of London, 637 F.3d 53 (1st Cir. 2011).

The same conclusion follows regarding Marrero. As explained above, changing an employee's vacation schedule and extending an employee's vacation leave does not amount

to an adverse employment action. But even if they were adverse employment actions, Cana has not produced sufficient evidence that his consitutionally protected conduct was the driving factor that caused the retaliation.

Cana testified that Marrero told him "after the trial being over" that "he's watching me to write me up and he couldn't because I'm doing my job." OSUF ¶ 22; Docket # 155-1 p 8-9. In another instance Cana heard Marrero telling others in the Police station "that I was the one who was stoolpigeoning and testifying against Johnny Cruz." OSUF ¶ 23. The alleged change of Cana's vacation schedule occurred during December 2011, and he testified before the grand jury at some point before September 2008; that is, more than three years before the alleged retaliatory actions.[12] There is thus no temporal proximity between Cana's grand jury testimony and Marrero's actions. Accordingly, Cana's retaliation claims against all defendants is **DISMISSED with prejudice**.

*Municipal liability*

A municipality "cannot be held liable for the constitutional violations of municipal employees on a respondeat superior theory." Rodríguez-García, 610 F.3d at 769 (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). Liability to a municipality, however, will attach under Section 1983 "only if the violation occurs pursuant to an official policy or custom." Id. (quoting Welch, 542 F.3d at 941). An official policy can be established "by showing that the alleged constitutional injury was caused by … a person with final policymaking authority … like mayors of municipalities in Puerto Rico" Id. "[I]t

---

[12] Even if taken from the conclusion of the criminal trial in March 2009, the change in the vacation schedule was almost three years after.

is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480; <u>see also</u> <u>Kelley v. LaForce</u>, 288 F.3d 1, 9 (1st Cir. 2002).

Because Plaintiffs failed to establish that the Mayor violated their constitutional rights, all claims against the Municipality are **DISMISSED with prejudice**. <u>See</u> <u>Kennedy v. Town of Billerica</u>, 617 F.3d at 531 ("<u>Monell</u> can impose municipal liability only for underlying, identifiable constitutional violations attributable to official municipal policy"); <u>Pica-Hernández v. Irizarry-Pagán</u>, 671 F.Supp.2d 289, 300 (D.P.R. 2009) ("With no injury inflicted[,] the Municipality cannot be subject to any liability").

*Supplemental jurisdiction claims*

Finally, Defendants argue that, absent any federal claims, this court should refrain from entertaining Plaintiffs' state-law claims. Docket # 111, p. 23. Plaintiffs have provided no argument against this contention. Docket # 118, p. 8.

A district court "retains the discretion … to decline to exercise supplemental jurisdiction where the district court has dismissed all claims over which it had original jurisdiction." 28 U.S.C. § 1367(c)(3); <u>Marrero-Gutiérrez v. Molina</u>, 491 F.3d 1, 7 (1st Cir. 2007). The court, however, must "exercise 'informed discretion' when deciding whether to assert supplemental jurisdiction over state law claims." <u>Redondo Const. Corp. v. Izquierdo</u>, 662 F.3d 42, 49 (1st Cir. 2011) (quoting <u>Roche v. John Hancock Mutual Life Ins. Co.</u>, 81 F.3d 249, 256-57 (1st Cir. 1996)). Such a determination implicates a weighing of several factors: to wit, comity, judicial economy, convenience, and fairness. <u>Id.</u>

Having evaluated the foregoing factors, and because Plaintiffs have failed to oppose Defendants' request, the Court declines to exercise supplemental jurisdiction over the state-law claims in this case. See id. ("'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors … will point toward declining to exercise jurisdiction over the remaining state-law claims"). Comity will be served by permitting the Commonwealth courts to resolve such issues of local concern.

**Conclusion**

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED**. Plaintiffs' remaining federal claims are therefore **DISMISSED with prejudice**, and their state law claims are **DISMISSED without prejudice**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of July, 2015.